UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FOURTH DIVISION

---

Wells Fargo Investments, LLC,
a wholly owned subsidiary of
Wells Fargo Investment Group, Inc.,

        Plaintiff,

v.

Jesse A. Bengtson,

        Defendant.

Case No. _____

---

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Wells Fargo Investments, LLC, ("Wells Fargo"), for its Complaint against Defendant Jesse A. Bengtson ("Bengtson") states and alleges as follows:

### Nature of Claim for Relief

1. This action arises from Bengtson's breach of a Wells Fargo Private Client Services Agreement Regarding Trade Secrets, Confidential Information and Non-Solicitation, ("Agreement") and Bengtson's common law duty of loyalty to Wells Fargo.

2. Prior to June 23, 2007, Bengtson was a registered representative with Wells Fargo's Wealth Management Group. In consideration for and at the inception of his Wells Fargo employment on June 23, 2005, Bengtson entered into the Agreement.

3. On June 22, 2007, Bengtson resigned voluntarily and began working for Merrill Lynch, Pierce, Fenner & Smith. Inc. ("Merrill Lynch"), performing the same service as he once had for Wells Fargo, and in doing so, violated the non-solicitation and other provisions of the Agreement and misappropriated Wells Fargo's confidential and proprietary client information. Upon information and belief, Bengtson is already competing unfairly by (1) interfering with Wells Fargo's existing and prospective client relations, (2) accessing confidential client information, which, upon information and belief, was physically taken from Wells Fargo by Bengtson; (3) using Wells Fargo's confidential customer information; and (4) soliciting Wells Fargo's customers for his new employer, Merrill Lynch.

4. To prevent continuing irreparable harm arising from this course of wrongdoing, not only to Wells Fargo but to customers, who have complained about this activity. Wells Fargo seeks immediate provisional injunctive relief barring Bengtson from using or continuing to use Wells Fargo's and its clients' proprietary and confidential information, from soliciting, either directly or indirectly, any client customer, prospect or referral whose name became known to Bengtson during his

employment with Wells Fargo, from violating other common law and statutory duties and obligations, and from damaging Wells Fargo's name through such action, pending determination of Wells Fargo's claims against Bengtson and his employer by a NASD panel in an expedited arbitration.

## Parties and Venue

5. Plaintiff Wells Fargo is a corporation organized and doing business under the laws of the State of Delaware with offices in downtown St. Paul and Minneapolis. Wells Fargo is a broker-dealer in securities registered with the State of Minnesota, and the National Association of Securities Dealers, Inc. ("NASD").

6. On information and belief, Bengtson resides at 7175 – 125th Street North, White Bear Lake, Minnesota. Until June 22, 2006, Bengtson was employed as a registered representative by Wells Fargo at its White Bear Lake, Minnesota office. Currently, Bengtson is employed by Merrill Lynch.

7. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff and the defendants are citizens of different states and the amount in controversy is in excess of $75,000.

8. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to this claim occurred in Minnesota.

## Factual Background

9. Bengtson was hired to replace a Wells Fargo registered representative who was reassigned to another position in the company for reasons not relevant to this litigation.

10. Wells Fargo paid a $250,000 "waffle" or forgivable loan to Bengtson at the time of his hire. Approximately one year later, Wells Fargo paid a back-end "waffle" in the amount of $194,600 to Bengtson.

11. To effectuate the waffles, Bengtson executed two Promissory Notes in favor of Wells Fargo whereby Wells Fargo would forgive of the sum of each waffle in sixty (60) monthly increments. Termination of Bengtson's employment constituted an event of default pursuant to the Notes, causing the balance of the Notes to become immediately due and owing to Wells Fargo.

12. At the time of Bengtson's hire, Wells Fargo provided him with approximately three-hundred thirteen (313) clients and a book of business worth a current estimated value of twenty-four million-dollars ($24,000,000) derived from pre-existing Wells Fargo customer accounts.

13. During the 90-day period after Bengtson's hire, Bengtson opened one-hundred three (103) accounts and increased this Wells Fargo business by an estimated current value of eleven million dollars ($11,000,000).

14. From September 20, 2005, to June 22, 2007, Bengtson opened one-hundred ninety-nine (199) new accounts and increased this Wells Fargo business by an estimated current value of twenty-four million dollars ($24,000,000).

15. On or about June 22, 2007, Bengtson resigned from Wells Fargo and began working at Merrill Lynch.

16. When Bengtson resigned, he serviced approximately six-hundred fifteen (615) total Wells Fargo accounts and this book of business had a current value of approximately sixty million dollars ($60,000,000).

17. A critical factor to Wells Fargo's continued success in Private Client Services is its relations between customers and registered representatives. Wells Fargo has built the loyalty of its customer base through many years of effort.

18. Immediately after Bengtson's resignation, Wells Fargo customers expressed their concerns about solicitations they received from Bengtson.

19. Upon information and belief, Bengtson took customer lists with him when he left Wells Fargo and is currently using the confidential Wells Fargo customer information contained therein in the course of his employment with Merrill Lynch.

20. Furthermore, Bengtson has failed to repay Wells Fargo the outstanding balance of the two promissory notes.

## THE PROMISSORY NOTES EXECUTED BY BENGTSON

21. Bengtson was hired by Wells Fargo on June 23, 2005. During his tenure, Bengtson executed two (2) Promissory Notes (copies of which are attached hereto as Exhibits A and B and are hereinafter incorporated by reference) in favor of Wells Fargo on June 22, 2005, and July 21, 2006, in the amounts of $250,000 and $196,294, respectively.

22. The principal and interest under the Notes was to be forgiven and taxed in sixty (60) equal monthly increments commencing on the first day of the month following disbursement of the proceeds of the Notes and continuing each month thereafter.

23. The Notes provide the outstanding balance shall immediately become due and payable in the following event(s) of default:

> The termination of the Undersigned's employment with WF (or one of its subsidiaries) for any reason whatsoever, including, but not limited to involuntary termination of the undersigned...

24. Bengtson defaulted on the Notes by failing to pay Wells Fargo the outstanding balance immediately upon termination of his employment with Wells Fargo.

25. As a result of Bengtson's default, a total balance of $311.765.00 remains due and owing to Wells Fargo, plus accruing interest at the contract rates.

26. Bengtson admitted liability on the Notes and communicated to Wells Fargo his willingness to repay the debt.

## THE NON-SOLICITATION AND TRADE SECRETS AGREEMENT

27.  The Agreement, a copy which is attached as Exhibit C and incorporated herein by reference, contains provisions regarding "Solicitation of Wells Fargo Customers and Employees."

28.  The Agreement provides:

> **If you resign or are terminated from your employment at the Firm for any reason, you agree that for a period of one year following your termination, you will not call upon or solicit (either directly or indirectly) any client, customer, prospect or referral whose name became known to you during your employment with the Company.**

29.  The Agreement further states:

> The only exception to this obligation will be as to your family members and customers whom you serviced prior to your hire date with the Company. Despite this exception, you acknowledge and agree that files and information relating to such customers remain the property of the Company and that copies of such information may be provided to you only if such customers provide the Company with written authorization for the release of their Confidential Information to you. You further acknowledge and agree that the Company is not precluded from contacting any of such customers.

30.  Wells Fargo's customer lists and other records are not available from other sources and have been created and updated for a period of years based on Wells Fargo's relationship with its clients. Wells Fargo has invested substantial corporate resources to develop and maintain its customer information. These resources include supplies, equipment, personnel and postage for direct mail solicitation, television advertising, print advertising and other miscellaneous marketing activities. Wells Fargo

has paid the entire expense of these activities, with no financial contribution from Bengtson whatsoever.

31.     Wells Fargo has also expended significant resources to service the customers previously assigned to Bengtson. These resources include execution costs for securities transactions, costs for staff, and equipment to perform stock option trade services. Wells Fargo has borne the entire expense of these services and activities, with no financial contribution from Bengtson whatsoever.

32.     Wells Fargo has undergone significant measures to keep its customer information confidential. Specifically, all employees must sign a Team Member Acknowledgment stating that they understand Wells Fargo's policies and Code of Ethics and that they will adhere to those policies and the code. The Code of Ethics specifically refers to customer information as confidential. It further provides that such information cannot be disclosed outside of Wells Fargo and that the information cannot be used to compete with Wells Fargo.

33.     The Agreement also governs Bengtson's use of Wells Fargo's trade secret and propriety information both during and after his employ with Wells Fargo. The Agreement provides:

> During the course of your employment . . you may acquire Confidential Information relating to the Company's customers. The Firm considers the identity of its customers, the contact person for that customer or client, and any information related to business conducted between the customer/client and the Company to be trade secrets and as such is confidential and

the sole and exclusive property of the Company. This information is to be used by you, solely and exclusively, for the purpose of conducting business on behalf of the Firm . . . You are expected to keep such records and information confidential and not to divulge or disclose this information except for that purpose.

\*   \*   \*

Understand that all such 'information' and 'records' constitute trade secrets of the Company and that your obligations continue at all times during and after your employment. This information does not become any less confidential or proprietary to the Company because you may commit some of it to memory or because you may otherwise maintain this information outside of the Company's offices.

34. The Agreement defines a "trade secret" as:

    information, including but not limited to, a formula, pattern, compilation, program, device, method, technique or process that: (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

35. The Agreement further states:

    The Company's trade secrets and confidential information constitute any information or knowledge, including but not limited to:

    - account or customer information, including prospective customer information
    - actual or potential customer names generated through the Company's Internal referral sources [and]
    - programs or models using Company data, regardless or source, which is not generally available to the public, such as strategic wealth process and strategy, or asset allocation information.

36. The definition of "Records" specifically includes "original, duplicated, computerized, memorized, handwritten or any other form of information."

37. "Information" is defined as:

> all names, addresses, telephone numbers, account numbers, balances, maturity dates, customer instructions, loans, investments, insurance or annuity policies, applications, investment objective, and any other personal or financial information of any account, customer, client, prospect, or referral.

38. Wells Fargo reminded Bengtson of his obligations pursuant to the Agreement in a letter, dated June 22, 2007, a copy of which is attached hereto as Exhibit "I."

## Bengtson's Wrongful Misappropriation of Confidential and Proprietary Information and Solicitation of Firm Customers

39. On or about June 25, 2007, Dennis Thonvold, a Wells Fargo Regional Manager, was contacted by a customer, John Doe No. 1. John Doe No. 1 complained of Bengtson's written and telephone solicitations and this customer expressed concern that his privacy, as well as Wells Fargo's pledge about that privacy, had been breached.

40. On or about June 23, 2007, John Doe No. 1 received a solicitation letter from Bengtson dated June 22, 2007, attached hereto and incorporated herein as Exhibit G. Attached to that solicitation letter was a Merrill Lynch account application and

Account Transfer Form ("ACATS").  See Exhibit H attached hereto and incorporated herein.

41.     On or about June 25, 2007, David Gibb, a Wells Fargo Senior Regional Manager, was contacted by a customer, John Doe No. 2.  John Doe No. 2 complained of Bengtson's solicitations and this customer expressed concern that his privacy, as wells as Wells Fargo's pledge about that privacy, had been breached.  On or about June 23, 2007, John Doe No. 2, who is a Wells Fargo customer, received a solicitation letter from Bengtson, dated June 22, 2007.  Attached to that solicitation letter was a Merrill Lynch account application and Account Transfer Form ("ACATS").

42.     On or about June 23, 2007, John Doe and Jane Doe No. 3, who are Wells Fargo customers, received a solicitation letter from Bengtson, dated June 22, 2007.  Attached to that solicitation letter was a Merrill Lynch account application and Account Transfer Form ("ACATS").

43.     Furthermore, on or about June 25, 2006, Wells Fargo began receiving numerous phone calls from Wells Fargo customers complaining about solicitation materials received from Bengtson.  Significantly, some customers stated Bengtson contacted them by telephone after his June 22, 2007, resignation for solicitation purposes.  To date, Wells Fargo has received approximately thirty (30) calls from its customers regarding Bengtson's unlawful solicitation.

<u>The Need for Provisional Injunctive Relief</u>

44. Unless Bengtson is enjoined and restrained from the acts described above pending determination of Wells Fargo's claims on the merits by a NASD panel, Wells Fargo will suffer immediate and irreparable injury, since the value of the information removed from Wells Fargo in violation of Minnesota law and in violation of the parties' Private Client Services Agreement are not subject to ready valuation, and since Wells Fargo will lose the goodwill of its customers. Indeed, provisional injunctive relief is particularly appropriate here to prevent Bengtson from profiting, or continuing to profit, from his wrongful actions.

## COUNT I
### (Breach of Contract –Solicitation of Wells Fargo's Customers)

45. Wells Fargo realleges and incorporates each and every allegation contained in all preceding paragraphs as if fully set forth herein.

46. Upon consideration for employment, job training, and other things, Bengtson entered into Private Client Services Agreement with Wells Fargo.

47. The Private Client Services Agreement, among other things, provides Bengtson may not, for a period of one year following termination of the employment relationship with Wells Fargo, call upon or solicit, either directly or indirectly, any customers of the Firm.

48. Bengtson breached the Private Client Services Agreement by soliciting, both directly and indirectly, Wells Fargo's customers seeking to transfer their accounts to a competitor, Merrill Lynch.

49.     Bengtson's ongoing breach of the Private Client Services Agreement is continuing in nature, and there is no adequate remedy at law.

## COUNT II
### (Breach of Contract- Disclosure of Trade Secret and Proprietary Information)

50.     Wells Fargo realleges and incorporates each and every allegation contained in all preceding paragraphs as if fully set forth herein.

51.     Upon consideration for employment, job training, and other things, Bengtson entered into Private Client Services Agreement with Wells Fargo.

52.     The Private Client Services Agreement, among other things, provides that Bengtson may not disclose trade secret and confidential information, specifically including, the identity of customers.

53.     Bengtson breached the Private Client Services Agreement by using and disclosing confidential customer information to solicit Wells Fargo's customers to transfer his accounts to a competitor, Merrill Lynch.

54.     Bengtson's ongoing breach of the Private Client Services Agreement is continuing in nature, and there is no adequate remedy at law.

## COUNT III
### (Conversion)

55.     Wells Fargo realleges and incorporates each and every allegation contained in all preceding paragraphs as if fully set forth herein.

56. By virtue of leaving Wells Fargo with the company's list of customer and client contacts, which is used to perform day to day operations, Bengtson has converted Wells Fargo's property.

57. The conversion of this property continues to irreparably harm Wells Fargo, and Wells Fargo does not have an adequate remedy at law.

## COUNT IV
### (Breach of Duty of Loyalty)

58. Wells Fargo realleges and incorporates each and every allegation contained in all preceding paragraphs as if fully set forth herein.

59. In planning, preparing, and departing from Wells Fargo, Bengtson fell far below the requisite conduct of employees. Specifically, and upon information and belief, by removing confidential and proprietary data for the purpose of soliciting Wells Fargo's customers to transfer their accounts to Merrill Lynch, by preparing to solicit Wells Fargo's customers for Merrill Lynch while still employed in the offices of Wells Fargo, and by soliciting Wells Fargo's customers, Bengtson breached his duty of loyalty to Wells Fargo.

60. By virtue of the foregoing improper conduct, Bengtson's failure to comply with these duties caused, and continues to cause, Wells Fargo to be, irreparably harmed.

## COUNT V
### (Misappropriation of Trade Secrets)

61. Wells Fargo realleges and incorporates each and every allegation contained in all preceding paragraphs as if fully set forth herein.

62. Confidential and proprietary information about Wells Fargo's customers accounts, including their names, addresses, account numbers and account contents, and other information about Wells Fargo's customers and clients is information that is generally not known or readily ascertainable by others outside of Wells Fargo through proper means.

63. Such confidential and proprietary information is not shared outside of Wells Fargo, and such information is generally subject to reasonable measures to protect its secrecy.  Such confidential and proprietary information are trade secrets as defined by Minn. Stat. §325C.01, subd. 5, and Bengtson knew or had reason to know that Wells Fargo intended expected the secrecy of the confidential and proprietary information to be maintained.

64. Such confidential and proprietary information is of economic value to Bengtson and other competitors of Wells Fargo.

65. Bengtson misappropriated the trade secrets and confidential and proprietary information of Wells Fargo and, on information and belief, are now using and disclosing such information in competition with Wells Fargo in violation of the common law and the Minnesota Uniform Trade Secrets Act, Minn. Stat. §325C.01-.08.

66. Under Minn. Stat. §325C.02 and principles of equity, Wells Fargo is entitled to injunctive relief against Bengtson, and those acting in concert with them, to enjoin Bengtson's misappropriation of trade secrets until such time when the trade secret ceases to exist and for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

67. Wells Fargo has been damaged by Bengtson's trade secret misappropriation in an amount in excess of $75,000. Wells Fargo is also entitled to its costs and attorneys' fees pursuant to Minn. Stat. §325C.04(iii).

WHEREFORE, Plaintiff Wells Fargo respectfully requests that this Court:

A. Grant Wells Fargo a preliminary injunction, until an NASD hearing, requiring Bengtson and any persons acting on behalf of or in concert with him, to return immediately to Wells Fargo all original and/or photocopied documents and or records, including the customer and client lists, including, but not limited to any MK01 lists,);

B. Grant Wells Fargo a preliminary injunction, until an NASD hearing, restraining and enjoining Bengtson, and any persons acting on behalf of or in concert with him, from discussing, using, disclosing or transmitting, directly or indirectly, any trade secret or proprietary information, including the identity of Wells Fargo customers;

C. Grant Wells Fargo a preliminary injunction, until an NASD hearing, restraining and enjoining Bengtson, and any persons acting on behalf of or in concert with him, from soliciting business from any Wells Fargo customers whose name became known to Bengtson while employed at Wells Fargo, and excluding any customers Bengtson obtained prior to his employment with Wells

Fargo and transferred to Wells Fargo during the initial 90-day period after Bengtson's hire (June 24, 2005, through September 20, 2005);

D.  Enter a preliminary injunction, until an NASD hearing, restraining and enjoining Bengtson and any persons acting on behalf of or in concert with defendants, from copying, disclosing, transmitting, reviewing, using, distributing, discussing, transferring, commenting or relying on or referring to any documents, or parts thereof, or any information contained in the records of Wells Fargo, including but not limited to, any: customer lists (or other documents identifying the name, address, telephone number, financial information, trading activities, net worth, income or investment history of a customer of Wells Fargo), or any other documents, materials or information that discuss, reference, summarize, identify or relate, directly or indirectly, to the records of Wells Fargo, and all such documents and records thereof be returned to Wells Fargo immediately;

E.  An Order for expedited discovery, with deposition date of July 11, 2007.

F.  Any other relief that this Court deems just and equitable.

FLYNN, GASKINS & BENNETT, L.L.P.

Dated: June 29, 2007

 s/ Steven E. Rau
Steven E. Rau, #147990
Sharon M. Horozaniecki, #337067
333 South Seventh Street, Suite 2900
Minneapolis, Minnesota 55402
(612) 333-9500
*Attorneys for Plaintiff Wells Fargo*